## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SAWBILL STRATEGIC, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, HOMESERVICES OF AMERICA, INC., KELLER WILLIAMS REALTY, INC., REALOGY HOLDINGS CORP., and RE/MAX HOLDINGS, INC.,<br><br>    Defendants. | Case No:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sawbill Strategic, Inc. ("Plaintiff") brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities who listed properties on one of twenty Multiple Listing Services ("the Covered MLSs") and paid a broker commission from at least April 15, 2015 until the Present (the "Class Period"). Plaintiff brings this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the federal antitrust laws against Defendants—the National Association of Realtors ("NAR"), as well as four national real estate broker franchisors: HomeServices of America, Inc., Keller Williams Realty, Inc., Realogy Holdings Corp., and RE/MAX Holdings, Inc. ("Defendant Franchisors")—and demands a trial by jury.

1

## NATURE OF ACTION

1.      Plaintiff is informed and believes, and thereon alleges, that the Defendants violated federal antitrust law by conspiring to require property sellers to pay the broker representing the buyer of their properties, and to pay an inflated amount.

2.      The foundation of Defendants' conspiracy is NAR's adoption and application of a rule requiring all brokers to make a non-negotiable offer of buyer broker compensation (the "Commission Rule") when a broker lists a property on a Multiple Listing Service ("MLS").

3.      Defendants and their co-conspirators possess market power through control local MLSs, which are databases of properties listed for sale in a particular geographic region. A majority of homes in the United States are sold on such MLSs. Through their control of the MLSs, Defendants and their co-conspirators have market power in the local markets for real estate broker services.

4.      Most MLSs are controlled by local NAR associations. Brokers must list properties on the MLS both in order to effectively market homes to potential buyers, and also to comply with requirements of being a MLS member.

5.      Access to MLSs is conditioned on the member brokers following all mandatory rules set out in NAR's Handbook on Multiple Listing Policy, including the mandatory Commission Rule.[1]

6.      Most buyer brokers will not show homes from sellers offering a lower buyer broker commission, instead being incentivized to show homes with higher commission offers

---

[1] *See* National Association of Realtors, Handbook on Multiple Listing Policy 2019, *available at* https://www.nar.realtor/sites/default/files/documents/2019-HMLP.pdf (hereinafter, "NAR Handbook").

first. In order to gain the cooperation of buyer brokers, sellers are therefore incentivized to offering a higher commission as part of the mandatory offer of buyer broker commission.

7.     Absent the Commission Rule, the cost of buyer broker commissions would be borne by the buyer in a competitive market. Buyer brokers would be paid by their clients and would therefore have to compete to offer a lower commission rate. The Commission Rule means that the buyer—who retains the buyer broker—does not ever negotiate or pay his or her broker's commission. This model ensures the restraint of price competition among buyer brokers.

8.     Furthermore, Defendants also prevent buyer brokers from making purchase offers on homes that are contingent on a reduction of the buyer broker commission.

9.     In a typical real estate transaction, there will be separate brokers presenting the seller and the buyer of a home, both being paid a percentage of the home's overall sale price. The current total broker compensation (the amount paid to both brokers in a transaction) is commonly five to six percent of the sale price of a home. Approximately half that amount is paid to the buyer brokers.

10.     In competitive foreign markets, home buyers pay their brokers less than half the rate paid to brokers in the United States, and in these comparable markets (including the United Kingdom, Germany, Israel, Australia, and New Zealand), buyer brokers are paid by home buyers, rather than home sellers.

11.     The Commission Rule has kept buyer broker commissions at around 2.5–3% of home sales price, even as the role of the buyer broker has diminished. Many home buyers do not rely on buyer brokers to find potential homes, but rather find their prospective homes through online services. In many cases, buyer brokers are only retained *after* the buyer has chosen a

home to buy. Despite this diminished role, the percentage of the buyer broker commission percentage has remained steady, in large part due to Defendants' conspiracy.

12.     The effect on the Commission Rule is made clear when examining the disconnect between buyer broker costs and commissions. Regardless of the price of the home sold, buyer broker costs are roughly similar. However, buyer brokers are paid *vastly* different sums when their client purchases a $150,000 house and a $1,500,000 house.

13.     For an example of how the Commission Rule plays out, a Class Member who sells a house for $200,000 would pay anywhere from $5000 to $6000 in additional commissions due to the conspiracy. In a competitive market where the Commission Rule was not mandated, the seller would not pay the buyer broker anything, and the total commission paid by the seller would be set at a level to only pay the seller broker.

14.     Plaintiff brings this lawsuit as a class action on behalf of home sellers who paid broker commissions since April 15, 2015 to the present in connection with residential real estate listed on any of the following Covered MLSs:

a.      The five separate MLSs that cover the Midwest metropolitan areas of Minneapolis, Minnesota; Milwaukee, Wisconsin; Detroit, Michigan; Columbus, Ohio; and Cleveland, Ohio.

b.      The six separate MLSs that cover the following metropolitan areas: Austin, Texas; Dallas, Texas; Houston, Texas; San Antonio, Texas; Las Vegas, Nevada; and Phoenix, Arizona.

c.      The three separate MLSs that cover the following metropolitan areas: Colorado Springs, Colorado; Denver, Colorado; and Salt Lake City, Utah.

d.      The four separate MLSs in the Southeast that cover the following metropolitan areas: Fort Myers, Florida; Miami, Florida; Charlotte, North Carolina; and Raleigh, North Carolina.

e.      My Florida Regional MLS (encompassing the metropolitan areas of Tampa, Orlando, and Sarasota, Florida).

f.      The Bright MLS (encompassing the metropolitan areas of Baltimore, Maryland; Philadelphia, Pennsylvania; Richmond, Virginia; and Washington, D.C.).

## JURISDICTION AND VENUE

15.     Plaintiff brings this action under Sections 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

16.     Plaintiff and the Class also seek attorneys' fees, costs, and other expenses under the federal antitrust laws. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332(d) and 1367, in that (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from some defendants; and (ii) Plaintiff's state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

17.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b), (c), and (d) because one or more Defendants transacted business in this District, is licensed to do business, or is doing business in this District; and because a substantial portion of the events

5

giving rise to the claims occurred within this District, and a significant number of members of the Class reside in this District.

## PARTIES

**Plaintiff**

18.     Plaintiff Sawbill Strategic, Inc. ("SSI") is a Minnesota corporation with its principal and registered offices at 200 Chestnut St E, Suite 203, Stillwater, Minnesota.  On July 18, 2016, SSI sold a home located at 7148 Jorgenson Lane S, Cottage Grove, Minnesota, which is in the Minneapolis/St. Paul metropolitan area.  This home was listed on Northstar MLS. In the transaction, SSI was represented by Collopy Real Estate, Inc. d/b/a Re/Max Results, a RE/MAX International, Inc. (d/b/a RE/MAX) franchisee.  The buyer was represented by Edina Realty, Inc.  In the transaction, SSI paid a total broker commission of five percent of the sale price, of which 2.7 percentage points were paid to the buyer's broker.

**Defendants**

19.     Defendant National Association of Realtors ("NAR"), a lobbying group that advocates for the interest of real estate brokers, is made up of over 1.2 million individual members and is headquartered in Chicago, Illinois. NAR oversees fifty-four state and territorial realtor associations and over 1,200 local realtor associations.

20.     HomeServices of America ("HomeServices") is one of the nation's largest real estate brokerages and is headquartered in Minneapolis, Minnesota. HomeServices owns, operates, and franchises many real estate brokerage firms, including HomeServices, Prudential Real Estate, Long & Foster, Real Living, and Edina Realty. HomeServices is an affiliate of Berkshire Hathaway.

21.     Keller Williams Reality, Inc. ("Keller Williams") is a privately-held company

headquartered in Austin, Texas that is one of the nation's largest real estate brokerages.

22.     Realogy Holdings Corp. ("Realogy") is a publicly traded company headquartered in Madison, New Jersey that owns, operates, and franchises many real estate brokerage firms, including Century 21, Coldwell Banker, Sotheby's International Realty, The Corcoran Group, Better Homes and Garden Real Estate, ZipRealty, ERA Real Estate, Citi Habitats, and Climb Real Estate. Realogy is the nation's largest real estate brokerage company.

23.     RE/MAX Holdings, Inc. ("RE/MAX") is a publicly traded company headquartered in Denver, Colorado that is one of the nation's largest real estate brokerages. There are approximately 6,800 offices and more than 100,000 sales associates at franchised RE/MAX locations around the country.

**Co-Conspirators and Agents**

24.     There are a number of local realtor associations not listed as named Defendants who nevertheless participated in the conspiracy, making statements and performing acts in furtherance thereof. Specifically, the local realtor associations that own and operate the twenty covered MLSs both complied with and implemented the Buyer Broker Commission Rule.

25.     By adopting the Buyer Broker Commission Rule into their own respective rules and regulations, the Covered MLSs (among others) participated as co-conspirators in the antitrust violations alleged herein, performing acts and making statements in furtherance thereof.

26.     Furthermore, the franchisees of Defendant Franchisors complied with and implemented the Buyer Broker Commission Rule in the geographic areas covered by the Covered MLSs. These franchisees thereby acted as co-conspirators in the anticompetitive violations alleged herein through their actions and statements.

27.     Defendants are jointly and severally liable for the acts of their co-conspirators,

whether or not these co-conspirators are named as defendants within this Complaint.

## FACTUAL ALLEGATIONS

**Real Estate Industry Background**

28.     In the real estate market, state licensing laws regulate who may represent buyers and sellers. There are two licensee categories: (1) the real estate broker (i.e., a brokerage firm) and (2) the individual real estate agents. Brokerage firms license individual real estate agents and retain legal responsibility for their licensed agents' actions.

29.     State law only permits licensed brokers—not individual agents—to receive payment for representing buyers or sellers in real estate transactions. This is the reason underlying why real estate brokerage contracts that sellers and buyers enter into are contracts with the brokers, rather than the agents. All payments to agents therefore pass through the brokers.

30.     NAR indicates that in 2017, 92% of all sellers sold their homes with help from a real estate broker and 87% of buyers purchased their home with the assistance of a real estate broker. These brokers and their agents act in dual roles, working sometimes as seller brokers for some home sales and other times as a buyer brokers for other properties.

31.     Typically, real estate brokers and agents receive compensation through commissions calculated from a percentage of the home's sale price, which are paid out when the home sells. The seller broker's compensation is set out in a listing agreement between the seller and the seller broker. The listing agreement specifies the details of the terms of the listing, and often states that a seller broker retains the exclusive right to market the seller's home. Notably, this listing agreement further specifies the total commission that the home seller must pay the seller broker, and if the buyer is working with a broker, a certain portion is set aside to pay a

commission to the buyer broker.

32. Buyers are represented by buyer brokers in the vast majority of residential real estate transactions, and therefore the total amount of seller's payment to the seller broker is set with the expectation a part of commission will be paid to the buyer broker.

33. Because buyer brokers do not receive their compensation directly from the buyers themselves, NAR's code of ethics permits brokers to represent their services as "free" even when the brokers expect to be compensated by another party.

34. When a buyer retains a broker, that buyer enters a contract with that broker. The contract typically discloses that the buyer broker will be compensated by a commission received through the seller broker.

35. In the listing agreement, the seller sets the total commission to be paid to the seller broker, with an expectation that part of the commission will go toward paying the commission of a buyer broker, who represent buyers in the vast majority of home sales.

36. Absent the Commission Rule—and because a seller would have no incentive to compensate a buyer broker actively negotiating against the seller's interest—a seller would agree to pay a commission that would go solely toward their own broker. The total commission paid by the seller would therefore be about half or less of the amount that sellers have paid due to the Commission Rule and Defendants' conspiracy.

**Multiple Listing Services ("MLSs") and the Commission Rule**

37. MLSs are databases of properties listed for sale in a particular defined geographic region that are accessible to real estate brokers and their agents in compliance with the rules of the MLS. A majority of homes in the United States are sold on such MLSs. The Covered MLSs defined *supra* are owned and operated by local realtor associations, which are in turn members

of, and governed by, NAR.

38.     As required my NAR rules and in order to make prospective buyers aware of the property, seller brokers list their clients' property on the MLS. If a property is not listed on MLS, most buyer brokers will not show that property to prospective buyers. Websites like Zillow and Redfin also use MLS as their main source of listings, and many prospective buyers use these websites to find homes. Without being listed on an MLS, it is very difficult for a home to be found by potential buyers.

39.     The Commission Rule requires a seller broker, on behalf of the seller, to make an offer of compensation to buyer brokers whenever a home is listed on the MLS owned by a NAR association. If a buyer represented by a broker purchases the home, then the buyer broker will receive the offered compensation.

40.     The process can be illustrated by the following example:

a.      A homeowner contracts with a seller broker and agrees to pay the seller broker six percent in total commission, in exchange for the seller broker's services in facilitating the sale of the home.

b.      The seller broker complies with the Commission Rule, offering a three percent commission to the buyer's broker when the property is listed on the NAR-operated local MLS.

c.      The buyer broker's client is shown the property, and the home is purchased for $200,000.

d.      The seller broker receives six percent of the sales price ($12,000) from the seller. The seller broker then pays three percent of the sales price ($6000) to the buyer broker.

**Anticompetitive NAR Rules**

41.     The Commission Rule was adopted by NAR in 1996 in its Handbook on Multiple

Listing Policy ("the Handbook"). The Commission Rule has been continuously in effect since

that time.

42.     In the most recent version of the Handbook, the Commission Rule is set out as

follows:

> In filing a property with the multiple listing service of an association of Realtors®,
> the participant of the service is making blanket unilateral offers of compensation to
> the other MLS participants, and shall therefore specify on each listing filed with the
> service, the compensation being offered to the other MLS participants. Specifying
> the compensation on each listing is necessary, because the cooperating broker has
> the right to know what his compensation shall be prior to his endeavor to sell.[2]

43.     The Handbook further states that "Multiple listing services shall not publish

listings that do not include an offer of compensation expressed as a percentage of the gross

selling price or as a definite dollar amount, nor shall they include general invitations by listing

brokers to other participants to discuss terms and conditions of possible cooperative

relationships."[3]

44.     As alleged *supra*, the Commission Rule shifts a cost to the seller that would

otherwise be borne by the buyer in a competitive market. The NAR's requirement that the seller

make a blanket, non-negotiable offer, the Commission Rule incentivizes sellers to cooperate with

buyer brokers by offering a high broker commission, as buyer brokers often will not show a

home offering a low buyer broker commission.

45.     Although by itself, the Commission Rule leaves the option open for the buyer to

reduce the brokers' commission by making that reduction a condition of a purchase offer on a

---

[2] NAR Handbook, at 65.
[3] NAR Handbook, at 35.

home, NAR has foreclosed that possibility through the adoption of a Standard of Practice in its

Code of Ethics:

> REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[4]

46. Without the Commission Rule and NAR's additional anticompetitive rules,

buyers rather than the sellers would pay buyer broker commissions, and the brokers would have

to engage in competition by offering lower commissions to prospective buyers.

**NAR's Oversight and Enforcement of its Anticompetitive Rules**

47. NAR has been successful in requiring that its members (which include state and

local realtor associations, as well as non-member brokers and agents which operate in geographic

areas with MLSs operated by local realtor associations) comply with its anticompetitive rules,

and with other rules set out in the Handbook and NAR's Code of Ethics.

48. NAR requires that its members that own and operate MLSs comply with the

mandatory provisions in the Handbook and the Code of Ethics. The Handbook sets out that an

agreement by a realtor association to establish an MLS must include "roles and responsibilities

of each association for enforcement of the Code of Ethics" and the "intent of multiple listing

service(s) to operate in compliance with the multiple listing policies of the National

Association."[5]

49. Local realtor associations own each of the Covered MLSs and are required to

monitor their MLS and the MLS's participants to ensure compliance with the mandatory

---

[4] National Association of Realtors, Code of Ethics and Standard of Practice (Jan. 1, 2019), *available at* https://www.nar.realtor/sites/default/files/documents/2019-COE.pdf.
[5] NAR Handbook, at 9.

provisions from the NAR Handbook. If a broker were denied access to a local MLS, that broker and its agents would be unable to prevented from listing properties for sale in the centralized database or from receiving offers of compensation for finding a buyer for a listed property.

50.    Failure to strictly comply with the Code of Ethics can lead to expulsion for NAR's individual and associational members. NAR's Code of Ethics and Arbitration Manual states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."[6]

51.    NAR's model rules for local realtor associations also require adherence to NAR's Handbook and Code of Ethics.

52.    NAR further penalizes noncompliance with its anticompetitive rules by withholding professional liability insurance from any associations operating under any bylaws or rules not approved by NAR.[7]

53.    NAR also reviews the governing documents of its local realtor associations to ensure compliance with NAR rules. Local realtor associations are required by NAR to demonstrate compliance with NAR rules by periodically sending copies of their governing documents to NAR for review.

**Defendant Franchisors Designed and Participated in the Conspiracy**

---

[6] National Association of Realtors, Code of Ethics and Arbitration Manual 2019, at 1, *available at* https://www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf.
[7] NAR Handbook, at 8 ("Those associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation.").

54.     Defendant Franchisors—HomeServices, Keller Williams, Realogy, and RE/MAX—orchestrated and participated in the alleged conspiracy in at least the following ways: (1) by requiring franchisees (and the franchisee's agents) to comply with NAR rules, including the Commission Rule; (2) by their executives' supervision of NAR operations, including the adoption, maintenance, and enforcement of the Commission Rule; and (3) by their franchisees influencing local realtor associations that have adopted and enforced NAR rules.

55.     Defendant Franchisors required their franchisees (and by extension, the franchisees' agents) located in the geographic markets in which the Covered MLSs operate and elsewhere to comply with NAR rules, including the Commission Rule. The franchisees (both located in the geographic markets in which the Covered MLSs operate and elsewhere in the United States) are required by the franchise agreements to (1) comply with NAR's Code of Ethics; (2) join and comply with the rules of the local realtor association; and (3) participate in and adhere to the rules of the local MLS, which include the mandatory rules set out in the NAR Handbook.[8]

56.     Executives from Defendant Franchisors actively participate in the management and operation of NAR, and in fact many of these executives sit on the Board of Directors or NAR's Professional Standard Committee, which promulgates the rules in NAR's Handbook and Code of Ethics.[9]

---

[8] One example of such a franchise agreement reads: "You agree that you and each of your Sales Associates will join and remain a member in good standing and comply with the by-laws and rules and regulations of a local Board of REALTORS© (or comparable organization) and, where available, you will become and remain a participant in a board owned multiple listing service. You also agree that you and your Sales Associates will abide by the Code of Ethics of the National Association of REALTORS©."

[9] Senior executives that currently serve on NAR's governing board include Ronald J. Peltier (Executive Chairman of HomeServices), Nancy Nagy (CEO of Berkshire Hathaway HomeServices KoenigRubloff Realty Group), and Bruce Aydt (Senior VP and General Counsel

57. NAR also has an eight-person Leadership Team to manage NAR's daily operations. In 2018, that team was dominated by executives of franchisees of the Defendant Franchisors.[10]

58. Executives of the franchisees of Defendant Franchisors have long implemented the alleged conspiracy through their participation in the governance of local realtor associations that own an operate the Covered MLSs, in addition to other local realtor associations. These executives and local realtor associations have required compliance with NAR rules, including the Commission Rule, and adopted the standard contract forms implementing these NAR rules.

59. The Defendant Franchisors heavily encourage their franchisees to become involved in local realtor association governance.[11]

60. Accordingly, in each of the areas in which the Covered MLSs operate (and elsewhere), the franchisees of Defendant Franchisors furthered the alleged conspiracy through their collaboration with the local realtor associations to implement and enforce compliance with NAR's rules, including the Commission Rule.

---

of Berkshire Hathaway HomeServices Alliance Real Estate) is the former Chair of NAR's Professional Standards Committee.

[10] The immediate past President of NAR, Elizabeth Mendenhall, is the CEO of RE/MAX Boone Realty in Columbia, Missouri. The President of NAR is John Smaby, a sales agent at Edina Realty, which is a HomeServices of America company. NAR's Vice President of Association Affairs, Colleen Badagliacco, is an agent for Legacy Real Estate & Associates, which is a franchisee of a Realogy firm. The 2019 leadership team includes John Smaby and Elizabeth Mendenhall, as well as Charlie Oppler, First Vice President and COO of a Sotheby's International Realty franchisee, and Tracy Kasper, Vice President of Advocacy and a broker/owner of a Berkshire Hathaway franchisee.

[11] Keller Williams' Policy & Guidelines Manual encourages its agents to participate "to the greatest possible extent" in state NAR associations and to "take an active role in" local realtor associations. The manual further stresses cooperation with other realtors: "We cooperate and live by the spirit of cooperation with all other REALTORS® and brokers." Keller Williams Realty, Inc., Policies & Guidelines Manual (Apr. 1, 2019), *available at* https://s3.amazonaws.com/prod-kwconnect-core/uploads/faq_resources_block_faqs_0_content/5ca2613326ef7.pdf.

**Comparison of Buyer Broker Commissions in Comparable Foreign Markets**

61.     Compared to other highly-industrialized countries with competitive markets for residential real estate brokerage services, the total broker commissions (the total amount paid to the seller broker and buyer broker) make up a significantly higher percentage in the areas in which the Covered MLSs operate. Economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States, and concluded that "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[12] Delcoure and Miller noted that

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . in the UK, the [total] commission rates average less than 2%. . . [i]n New Zealand and South Africa, [total] commission rate average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[13]

Delcoure and Miller also noted variation within countries. For example, in the UK, 1–2% is typical for total broker commissions, but based on market competition, the percentages can dip to 0.5–0.75% (in highly competitive areas) or spike to 3.5% (in lower-priced areas).[14]

62.     In comparison, the total broker commissions in the areas in which the Covered MLSs operate average between 5–6%, with buyer broker commissions by themselves holding steady at 2.5–3%. These numbers have remained stable despite home prices rising (leading to a larger commission amount) and the role of the buyer broker decreasing in importance (as discussed *supra*).

---

[12] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 International Real Estate Review 13 (2002).
[13] *Id.* at 14.
[14] *Id.* at 17.

## RELEVANT MARKETS

63.     The relevant market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with MLS access. Defendants' control of the Covered MLSs allows Defendants to impose the Commission Rule and other anticompetitive NAR rules on Class Members and other market participants. Access to the Covered MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate.

64.     The relevant geographic markets for the claims asserted herein are no broader than the geographic areas in which the twenty Covered MLSs operate. Almost every home sold in these geographic areas was listed on the MLS by brokers subject to the MLS and NAR rules and standards. The residential real estate business being local in nature, most sellers prefer to work with a broker familiar with local market conditions and who maintains an office or affiliated sales associates within a reasonable distance of the seller's property. Similarly, most potential buyers of property in a particular city, community, or neighborhood, typically prefer to work with a broker who has knowledge of the area where they have an interest.

65.     Defendant Franchisors, through their co-conspirator franchisees and other conspiring brokers in the areas in which the Covered MLSs operate, together provide the vast majority of the residential real estate broker services in these areas.

66.     Defendants and their co-conspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

67.     Any buyer brokers in the areas in which the Covered MLSs operate who desire to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants'

effective total control of the Covered MLSs through their co-conspirators means that hypothetical non-conspiring brokers would have to create an alternative listing service to compete with the conspiring brokers. Alternatively, a non-conspiring broker would have to attempt to compete without a listing service at all.

68.     A seller's broker without access to a listing service would be unable to reach the large majority of potential buyers, and a broker representing a buyer without access to a listing service would be unable to reach the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

69.     If a broker were to take the route of creating an alternative listing service in an attempt to effectively compete with one of the Covered MLSs, the alternative would need to have listings nearly as comprehensive as the Covered MLS. But brokers and their agents currently profiting from inflated buyer broker commissions have little to no incentive to participate on an alternative listing service generating lower buyer broker commissions. And many buyers would similarly hesitate to retain a buyer broker operating on an alternative listing service that required them to pay the buyer broker commission, when other buyer brokers operating on the Covered MLSs are entirely compensated by home sellers. Accordingly, seller brokers on an alternative listing service would struggle to attract buyer brokers and their buyer clients.

70.     Moreover, without a track record of success, many home sellers would hesitate to retain brokers on a new, unfamiliar alternative listing service, especially one that had failed to attract sufficient buyers and buyer brokers. Any listing service attempting to compete with any of the Covered MLSs would likely fail to attract enough property listings to operate profitably and to function as a competitor to the incumbent MLS. This very steep entry barrier is illustrated by

the notable absence of listing services that compete with the Covered MLSs (or other MLSs).

71. To quash any potential competition, NAR also advises MLSs to enter into noncompete agreements with third-party websites, such as Zillow and Redfin, to prevent competitive rivals for the MLSs. NAR's checklist of "critical components" for these agreements states that the consumer-facing websites "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation." The noncompete agreement requires the consumer-facing website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." NAR has therefore advised MLSs to take affirmative steps to further the alleged conspiracy by preventing third-party websites from becoming possible competitors.

## CLASS ACTION ALLEGATIONS

72. Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3), on behalf of the members of the following class:

> All persons and entities within the United States who, from April 15, 2015 through the present, paid a broker commission in connection to the sale of residential real estate on one of the Covered MLSs.

73. Specifically excluded from the Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

74.     The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiff believes that the Class numbers in the thousands, the exact number and identity of Class Members being known to Defendants and Defendants' co-conspirators.

75.     The Class is readily ascertainable because records of the relevant transactions should exist.

76.     This action is brought and may properly be maintained as a class action pursuant to the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1)-(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.  Common questions of fact and law exist as to all Class members which predominate over any questions affecting only individual Class members.  These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any Class member, include the following:

a.   Whether Defendants engaged in the conspiracy as alleged herein;

b.   The identity of the participants in the alleged conspiracy;

c.   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

d.   Whether the effect of Defendants' conspiracy was to inflate both buyer and total commissions;

e.   Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

f. Whether Plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief; and

g. The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

77. Plaintiff's claims are typical of the claims of the Class members. Plaintiff and other Class members must prove the same facts in order to establish the same claims, described herein, which apply to all Class members.

78. Plaintiff SSI is an adequate representative of the Class because it is a member of the Class and its interests do not conflict with the interests of the Class members it seeks to represent. Plaintiff has retained counsel competent and experienced in the prosecution of complex class action antitrust litigation, and together Plaintiff and its counsel intend to prosecute this action vigorously for the benefit of the Class. The interests of Class members will be fairly and adequately protected by Plaintiff and its counsel.

79. A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts, in which individual litigation of hundreds of cases would proceed. Individual litigation presents a potential for inconsistent or contradictory judgments, the prospect of a race for the courthouse, and an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation increases the expense and delay to all parties and the court system in resolving the legal and factual issues

common to all Class members' claims relating to Defendants' unlawful conduct. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

80. The various claims asserted in this action are additionally or alternatively certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

  a. The prosecution of separate actions by thousands of individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, thus establishing incompatible standards of conduct for Defendants;

  b. The prosecution of separate actions by individual Class members would also create the risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class members who are not a party to such adjudications and would substantially impair or impede the ability of such non-party Class members to protect their interests; and

  c. Defendants have acted on grounds generally applicable to the entirety of the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

## ANTITRUST INJURY

81. Defendants' anticompetitive agreements have had the following effects, among others:

  a. Sellers of residential property have been forced to pay inflated costs to sell their homes through forced payments of commissions to buyer brokers;

b. Home sellers have been forced to set buyer broker commissions to induce buyer brokers to show the sellers' homes to the brokers' clients;

c. Price competition among home buyers has been restrained through the buyers' inability to compete for the purchase of a home by lowering the buyer broker's commission;

d. Price competition among brokers to be retained by home buyers has been restrained;

e. Defendant Franchisors and their franchisees have inflated their profits by a significant margin by the increased buyer broker commissions and total commissions.

82. By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher total commissions than they would have paid in the absence of Defendants' anticompetitive conspiracy, and as a result have suffered damages.

83. There are no pro-competitive effects of Defendants' conspiracy that are not substantially outweighed by the conspiracy's anticompetitive effects.

84. As backed up by significant economic evidence, Defendants' conspiracy has instead resulted in Class Members paying buyer broker commissions and total commissions that have been inflated to a supracompetitive level nationwide, including in the geographic areas in which the Covered MLSs operate.

85. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIOLATION OF THE SHERMAN ACT

### FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### 15 U.S.C. § 1

86.    Plaintiff incorporates the allegations in each above numbered paragraph.

87.    Beginning at least four years before the filing of this complaint, and continuing through the present, Defendants entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce, thereby violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

88.    The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

89.    In formulating and carrying out the conspiracy, Defendants and their co-conspirators committed one or more of the following overt acts:

      a.    Participation in the creation, maintenance, and application of the Buyer Broker Commission Rule;

      b.    Participation in the creation, maintenance, and application of rules by local NAR associations and MLSs that applied the Buyer Broker Commission Rule in the areas in which the Covered MLSs operate; and

      c.    Requiring franchisees of Defendant Franchisors, through provisions in franchise agreements, to apply the Buyer Broker Commission Rule in the areas in which the covered MLSs operate.

90.    Defendants' conspiracy has required that sellers pay buyer brokers an inflated buyer broker commission, and therefore an inflated total commission. This has restrained price

competition among buyer brokers, a competitive harm that substantially outweighs any competitive benefits arising from the conspiracy.

91.     In connection with the sale of residential real estate listed on the Covered MLSs, Plaintiff and other Class Members paid inflated commissions during and before the last four years. Were it not for Defendants' conspiracy, Plaintiff and Class Members would have paid significantly lower commissions because the brokers representing the buyer of the homes would have been paid by the buyers.

92.     Plaintiff and the Class Members have been injured in their business and property as a direct and proximate result of Defendants' continuing violation of Section 1 of the Sherman Act, and suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays for judgment against Defendants as follows:

1.     An Order certifying the Class under the appropriate provisions of Federal Rule of Civil Procedure 23, and appointing Plaintiff and its counsel to represent the Class;

2.     Declarations that the actions of Defendants, as set out above, are unlawful;

3.     A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from (1) requiring that sellers pay the buyer broker and (2) continuing to restrict competition among buyer brokers;

4.     Appropriate injunctive and equitable relief;

5.     Compensatory damages;

6.     Punitive damages;

7.     Statutory damages;

8. Restitution and/or disgorgement;

9. Costs, disbursements, expenses, and attorneys' fees;

10. Pre- and post-judgment interest, to the extent allowable; and

11. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, on behalf of itself and all others similarly situated, hereby demands a trial by jury in this case as to all issues so triable.

Dated: April 15, 2019                           Respectfully submitted,

_s/_        Thomas A. Doyle

Kenneth A. Wexler
Mark R. Miller
Thomas A. Doyle
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-222
Facsimile: (312) 346-0022
Email:  kaw@wexlerallace.com
         mrm@wexlerwallace.com
         tad@wexlerwallace.com

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Kaitlyn L. Dennis
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email:  dgustafson@gustafsongluek.com
         dhedlund@gustafsongluek.com
         dnordin@gustafsongluek.com
         kdennis@gustafsongluek.com

*ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASS*

26